# EXHIBIT "A"

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------------x

JOE HAND PROMOTIONS, INC.,

                          Plaintiff,

                                              Case No: EDCV11-00531-WDK

            - against -

DION LEVERING WILLIAMS, Individually,
and as an officer, director, shareholder, and/or
principal of HOTLANTA WINGS & THINGS
WEST, INC. d/b/a HOTLANTA WINGS
3950 Pierce Street
Riverside, CA 92505,

and

HOTLANTA WINGS & THINGS WEST, INC.
d/b/a HOTLANTA WINGS
3950 Pierce Street
Riverside, CA 92505,

                         Defendants.

-------------------------------------------------------x

**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF PLAINTIFF'S APPLICATION FOR
DEFAULT JUDGMENT BY THE COURT**

**STATE OF PENNSYLVANIA**               )

                                           ) **ss:**

**COUNTY OF BUCKS**                      )

      I, JOE HAND, JR., being duly sworn, depose and state the following:

      1.      I am the President of Plaintiff, JOE HAND PROMOTIONS, INC., and as such I am fully familiar with the facts, circumstances, and proceedings heretofore had herein.

      2.      I make this affidavit in support of Plaintiff's request to recover statutory damages, including attorneys' fees, investigative costs, and interest in the within request for judgment by default.

3.     Our company, JOE HAND PROMOTIONS, INC., is a closed circuit distributor of sports and entertainment programming.  Our company purchased and retains the commercial exhibition rights to the "UFC 114: Rampage v. Evans" Broadcast, including all undercard bouts and the entire television broadcast, scheduled for May 29, 2010, (hereinafter referred to as the "Broadcast").  Our company thereafter marketed the sub-licensing (commercial exhibition) rights in the *Program* to our company's commercial customers (i.e., casinos, racetracks, bars, restaurants, and nightclubs). A true and correct copy of the Agreement is attached to Plaintiff's Motion for Default as Exhibit "A-1".

4.     Simultaneously with the advent of pay-per-view programming, we began to experience serious erosion in the sales of our own proprietary programming to our commercial customers throughout the United States of America.  To protect ourselves, we endeavored to find out what was the basis for the erosion and determined from our customers that the cause of the erosion of our customer base was the rampant piracy of our broadcasts by unauthorized and unlicensed establishments (signal pirates).

5.     In response, we embarked upon a nationwide program to police our signals for the purpose of identifying and prosecuting commercial establishments which pirate our programming (including the Rampage and Evans event, the subject programs involved in this lawsuit).

6.     Specifically, JOE HAND PROMOTIONS, INC. retained, at considerable expense, auditors and law enforcement personnel to detect and identify signal pirates.  To ensure that only illegal locations were visited by the auditors, our company compiled our confidential list of customers (authorized and legal locations) who paid the required license fee to broadcast

the *Program*, and this list was distributed to participating auditing and law enforcement agencies in strict confidence.

7.      The above-referenced *Program* contained several televised under-card bouts and color commentary, along with the main event prizefight between Rampage and Evans.  As set forth within the sworn Affidavit of Martin Dante, it was the undercard fights between Bisping and Miller, which Mr. Dante observed as being *unlawfully* exhibited by the establishment doing business as "Hotlanta Wings" on Saturday, May 29, 2010 (as at no time did this establishment ever lawfully license the *Program* from our company for such a purpose). A true and correct copy of the Affidavit of Martin Dante is attached Hereto as exhibit "A-2."

8.      Domestic commercial establishments, which contract with us, were required to pay my company a commercial sublicense fee to broadcast the *Program*.  This sublicense fee for the *Program* was based on the capacity of the establishment and varies for each event.  For example, for this particular event, if a commercial establishment had a maximum fire code occupancy of 50 persons, the commercial sublicense fee would have been $900.00 A true and correct copy of the Rate Card is attached hereto as Exhibit "A-3."

9.      It is essential that I communicate to the Court that to the best of my knowledge our programming is *not* and cannot be mistakenly, innocently, or accidentally intercepted.  Some methods that a signal pirate can unlawfully intercept and broadcast our programming are as follows without limitation:

A.      The use of a "blackbox," "hotbox," or "pancake box" which is purchased for a fee and when installed on a cable TV line will allow for the descrambled reception of a pay-per-view broadcast, or

3

B.      The use of a "smartcard" or "test card" or "programming card" which is purchased for a fee and when installed on a DSS satellite receiver line will allow for the descrambled reception of a pay-per-view broadcast, or

C.      The purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of a pay-per-view (or prohibited) programming at the residential rate, or

D.      The use of illegal cable drop or splice from an apartment or home adjacent to the commercial establishment premises (which would purchase the broadcast at a residential price and divert the program to the commercial establishment), and/or

E.      The purchase of other illegal unencryption devices, and the purchase of illegal satellite authorization codes which are readily available on the internet, in trade publications, and through "word of mouth."

10.      Turning these facts to the matter before the Court I have been advised by counsel that the Court has wide discretion in the awarding of statutory damages for nefarious, illegal and debilitating activities of signal pirates which are injurious to our company and our lawful customers.

11.      It is respectfully submitted to this Honorable Court that the unchecked activity of signal piracy not only has resulted in our company's loss of several millions of dollars of revenue, but also has a detrimental effect upon lawful residential and commercial customers of cable and satellite broadcasting whose costs of service are increased significantly by these illegal activities, including the depravation of tax revenue to the communities where our potential customers reside, and the denial of benefits such tax revenue would provide the residents of such communities.

12. We, at JOE HAND PROMOTIONS, INC., believe that the persistent signal piracy of our programming costs our company, our customers, and their communities millions of dollars annually resulting in part, from the perceived lack of consequences (including nominal or minimal damage awards by the Courts who hear our cases).

13. For these reasons I ask this Honorable Court to grant a substantial allowance for statutory damages due to the fact that such actions are *per se* intentional and do not and cannot occur without the willful and intentional modification of electronic equipment, the willful and fraudulent misrepresentation of a commercial establishment as a residential one, the removal of cable traps or devices designed to prevent such unauthorized exhibits, or other willful and/or international acts purposely designed to obtain our programming unlawfully.

14. I am also troubled by the fact that the Courts have placed undue weight upon whether the *promotion* of programming by the signal pirates (rather than the *exhibition* of the programming itself) was done willfully and/or for commercial benefit. I would ask the Court to recognize that the willful and purposeful acts necessary to intercept and exhibit the programming precede whatever steps are, or are not taken, by the pirate establishment to promote our programming to their customers.

15. I would also ask the Court to recognize that the pirates do not generally advertise the fact that they intend to exhibit our programming unlawfully to the public for the practical reason that they wish to avoid the unessential risk of detection. This of course does not preclude the very real possibility fact that the unlawful exhibition may well have been promoted by word of mouth or advertising that went undetected by the auditors, to their own customers to increase their financial gain on the night our programs are broadcast at their establishment.

16.    In addition, it is extremely unlikely that a pirate establishment would increase the costs of food or drink on the evening they are broadcasting one of our programs unlawfully.  In my personal experience gained through many years in the promotion industry, it is most uncommon that even our legal locations would employ such a method to recover some of our commercial license fee back from their own customers.  I would point out however that since our auditors do not benchmark the prices charged for food or drink at the pirate locations subsequent to conducting the field surveillance on the evening our programming is broadcast, it is undetermined whether the prices paid by an auditor at a pirate location on fight night are in fact less than or equal to the normal prices charged by the pirate establishments.

17.    I also believe it particularly important that the Court understand that the overwhelming majority of pirate establishments do not, and likely will not, ever charge a cover or door charge to their customers on the evening our programming is exhibited.  To do so would defeat the very purpose of pirating on programming in the first place: to lure or retain patrons who seek to be entertained by our programming.  If the pirate demanded a cover charge of its patrons then the competitive advantage he or she held over our lawful customers (who regularly impose a cover charge) would dissipate and the pirate's patrons would be faced with a choice of viewing our programming at the pirate establishment or at our lawful customer's locations where the broadcast environment may be much more attractive (i.e., more monitors, bigger monitors, no risk of interference or interception, etc.).

18.    Clearly, this establishment with multiple television monitors, and a physical established location, had no justification to steal our programming and exhibit it for its own financial benefit, except to deny our company the commercial license fee to which was rightfully entitled.

**WHEREFORE** I respectfully request that this Court grant our request for enhanced statutory damages and our prayer for actual damages, plus our legal costs along with the attorneys' fees counsel has requested, and that such amounts be awarded against the Defendants named in this action and in our favor.

Respectfully submitted,

Dated: 8/11/11

**JOE HAND, JR.,** President
Joe Hand Promotions, Inc.

Sworn to before me on this ___11___ day
of _August_____, 2011

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SUSANNE KELLY, Notary Public
Lower Southampton Twp., Bucks County
My Commission Expires October 9, 2013

7

# EXHIBIT "A-1"

# DISTRIBUTORSHIP AGREEMENT

This Distributorship Agreement ("Agreement") is made and entered into effective as of December 1, 2007, by and between Zuffa, LLC d/b/a the Ultimate Fighting Championship® ("UFC") organized under the laws of the State of Nevada, with its principal place of business located at 2960 West Sahara, Suite 100, Las Vegas, Nevada 89102 ("ZUFFA"), and Joe Hand Promotions, Inc., a corporation chartered in the State of Pennsylvania with its principal place of business located at 407 E. Pennsylvania Boulevard, Feasterville, Pennsylvania 19053 ("JHP").

## RECITALS

**WHEREAS**, ZUFFA produces a variety of entertainment events, centered around live pay-per-view broadcasts of UFC events of mixed martial arts competitions; (hereinafter referred to as the "Event(s)")[1];

**WHEREAS**, JHP is engaged in the business of promoting and distributing commercial closed-circuit events;

**WHEREAS**, ZUFFA desires to show its Events on closed circuit television and JHP desires to promote and distribute all pay-per-view Events on closed circuit television in continental United States, Alaska, Hawaii, and Puerto Rico (the "Market Territory");

**NOW THEREFORE**, in consideration of the above and for other valuable consideration ZUFFA and JHP agree as follows:

## APPOINTMENT AND NATURE OF JHP

1.   ***Appointment of JHP.***   Subject to the terms and conditions set forth in this Agreement, ZUFFA hereby grants JHP the exclusive right during the Term (defined below) to distribute the Events through the Distribution Channel (defined below) in the Market Territory, and JHP agrees fully and faithfully to perform and discharge the duties, obligations, and responsibilities provided for in this Agreement.  ZUFFA represents that it has no other such agreements with any other distributor in the Market Territory. Permitting distribution of the Events by any other entity in the Market Territory by another distributor shall be considered a breach of this Agreement.

2.   ***Distribution Channel.***   JHP shall be the exclusive distributor of commercial closed circuit television of the Events and may only distribute the Events through closed circuit television only to commercial outlets (the

---

[1] JHP understands that ZUFFA produces other UFC Events for broadcast of free television, such as Spike TV and potentially other television outlets, and JHP acknowledges and agrees that the rights described herein have no control over such other UFC television programming.

"Distribution Channel".) Unless prior written approval by ZUFFA is received, closed circuit television as defined herein does not include (i) closed circuit television locations or establishments located in Clark County, Nevada; (ii) closed circuit television locations or establishments located within thirty (30) miles of the Event site; and (iii) closed circuit located at any hotel-casino within a twenty (20) mile radius from the Event site or any affiliate hotel-casino of the Event host hotel-casino or Event host sponsor(s).  Additionally, nothing herein shall in anyway limit or restrict ZUFFA's absolute rights to show the Events to residences, hotel rooms, dormitories, military base residential living, and all similar locations, via any and all means and modes of pay-per-view television, Internet, wireless, broadband, and all other means or modes now known or hereafter developed.

3.      **Authority and Capacity.**  JHP is an independent contractor, is not an agent of ZUFFA, and is not authorized to waive any right or to incur, assume or create any debt, obligation contract or release of any kind in the name of or on behalf of ZUFFA.  Nothing herein shall be construed so as to create an employer-employee, agency, partnership, or joint venture relationship between the parties hereto.

4.      **Scope of Event.**  JHP agrees that it will not electronically distribute directly or indirectly, through itself or others, any other non-boxing-affiliated fighting contests, including mixed-martial arts contests ("MMA"), in the Market Territory during the term of this Agreement or any extensions thereof. For purposes of this section, MMA shall be defined as unarmed combat involving the use of a combination of techniques from different disciplines of the martial arts, including, without limitation, grappling, kicking and striking. It is understood that this provision does not include World Wrestling Entertainment. Regulated boxing matches undertaken under the auspices of a recognized boxing federation and/or a state boxing commission shall not be considered a competing Event for the purpose of this Agreement.

5.      **Term.**  Th



e obligations set

6.      **Estimated Number of Events.**  
it

or

## JHP OBLIGATIONS

7.    **Best Efforts to Market.**  JHP shall exercise its best efforts to advertise, promote and market the Event and to promote the goodwill of ZUFFA and the market reputation of the Event.  JHP shall conduct its activities related to the marketing of the Event in a professional manner and in accordance with the reasonable policies and procedures of ZUFFA and the terms of this Agreement.

7.1



8.    **Promotional Materials Accounting.**

9.    **Advertising.**  JHP shall advertise the Event in a manner that will develop customer interest and confidence in ZUFFA and in the Event.  JHP shall be entitled, during the term of this distributorship created by this Agreement  to advertise and hold itself out as an authorized distributor of the Event through the Distribution Channel.  JHP shall submit examples of all proposed advertisements and other promotional materials of the Event to ZUFFA for inspection and JHP shall not use any such advertisements or promotional materials without having received the prior written consent of ZUFFA to do so.  JHP shall not, pursuant to

this Agreement or otherwise, have or acquire any right, title or interest in or to ZUFFA's Trademarks.

9.1    JHP shall prepare all documentation necessary to meet the legal requirements of the closed-circuit distribution, including but not limited to: (i) preparation of licenses and technical documentation for each location, (ii) distribution of marketing and promotional materials, and (iii) collection of all funds and preparation of sales and revenue reports in a timely fashion.

9.2    JHP shall provide direct marketing, such as mailing pieces and other forms of advertising to create awareness of the program.  Such direct marketing shall comply with all Federal, State and local laws.

9.3    With approval by ZUFFA, JHP may utilize the services of other regional closed-circuit distributors to maximize the sales and distribution efforts on this program.  Any such company shall be bound under the same terms and conditions listed in any contract between JHP and ZUFFA.  ZUFFA shall not be subject to any double commissions and JHP agrees to be solely responsible for any and all commissions, fees and other amounts that may be due to any sub-distributors. JHP shall indemnify, defend and hold ZUFFA, its officers, directors, members, employees and agents harmless from and against all claims of other regional closed-circuit distributors.

10.    *Security.*  JHP shall make a concentrated effort to discourage theft of service.  Upon written demand, JHP shall provide ZUFFA with a complete list of verifiable customers.  In an effort to protect the closed-circuit broadcast rights, JHP will coordinate and finance its own piracy program. ███████████████████

11.    *Event Casino Fees.* ████████████████████████████████████████████████

ZUFFA OBLIGATIONS

12.    ZUFFA hereby grants JHP permission to enter into agreements with DirecTV, Dish Network, other DBS satellite providers and individual cable system operators, which shall act as authorization sources for their commercial customers utilizing that technology to broadcast the event.  If necessary, JHP shall ask ZUFFA and ZUFFA shall cooperate to assist in its negotiations with these digital authorization sources in order to reach an agreement on terms for

authorizing the requested commercial account.  JHP shall use its best efforts to obtain the most favorable terms and fees from all such providers.

## FINANCIAL



13.

13.1

13.2

14.

## INTELLECTUAL PROPERTY AND INDEMNIFICATION

15.   *Proprietary Rights.*

Territory



15.1

15.2

16. **_Unauthorized Use._** JHP agrees to give ZUFFA prompt written notice of any unlicensed use by third parties of ZUFFA's trademarks or tradenames and that JHP will not, without ZUFFA's written consent, bring or cause to be brought any criminal prosecution, lawsuit, or administrative action for infringement, interference with or violation of any rights to trademarks or tradenames.  JHP

agrees to cooperate with ZUFFA, and, if necessary, to be named by ZUFFA as a sole complainant or co-complainant in any action against an infringer of the ZUFFA's trademarks or tradenames, and notwithstanding any right of JHP to recover same, legal or otherwise, JHP agrees to pay ZUFFA, and hereby waives all claims to, all damages or other monetary relief recovered in such action by reason of a judgment or settlement whether or not such damages or other monetary relief, or any part thereof, represent or are intended to represent injury sustained by JHP as a distributor hereunder; in any such action against infringer, ZUFFA agrees to reimburse JHP for reasonable expenses incurred at ZUFFA's request, including reasonable attorney's fees if ZUFFA has requested JHP to retain separate counsel, or has approved the retention of separate counsel.  JHP shall have the right but not the obligation to assert any independent claims it may have against an alleged infringer and, in such case, any damages awarded to JHP on its independent claims shall be the sole property of JHP.  To the extent that independent claims are asserted but no allocation of damages is made then all such damages shall be allocated as though they were revenue.

17.    *Confidentiality.*



**INDEMNIFICATION**









25. **Remedies.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26. **Regulatory Termination.** In the event that a Regulatory Problem (as hereinafter defined) arises at any time as a result of this Agreement or the underlying relationship between the ZUFFA and JHP (or any of their affiliates, members or subsidiaries), ZUFFA shall take all action deemed reasonably necessary by its officers, members, managers or advisors, including, without limitation, amending or terminating this Agreement, in order to eliminate such Regulatory Problem. For purposes of this Section, "Regulatory Problem" means any circumstances such that ZUFFA's continued affiliation or contractual relationship with JHP (or any affiliate thereof), is deemed likely, in the reasonable judgment of ZUFFA, based on a verbal or written inquiry or verifiable information or information received from any gaming or athletic authority, to preclude or materially delay, impede, jeopardize or impair the ability of ZUFFA or any of its officers, owners, members, managers, employees or affiliates to obtain or retain any gaming or athletic license, or such as may result in the imposition of materially burdensome terms and conditions on any such gaming or athletic license, or such as could subject ZUFFA or any of its officers, owners, members, managers, employees or affiliates to any disciplinary proceedings by any gaming or athletic authority, or such as would constitute a violation of the gaming or athletic laws.

## FORCE MAJEURE AND COMPLIANCE WITH LAWS

27. **Force Majeure.** If either party is delayed, or interrupted in, or prevented from the performance of its obligations hereunder by reason of an act of God, fire, flood, war, public disaster, strikes or labor difficulties, governmental enactment, regulation or order, or any other cause beyond its control, and if such party has given the other party prompt notice hereof and, on request, such confirmatory documentation as the other party may reasonably request and has in good faith kept the other party apprised of when the delay, interruption or prevention is expected to be resolved, the time for the performance of the party's obligations shall thereupon be extended for a period equal to the duration of the contingency that occasioned the delay, interruption or prevention, but not exceeding sixty (60) days unless otherwise mutually agreed. If the force majeure condition continues for more than sixty (60) days, either party may terminate this Agreement upon written notice to the other party.

28. **Compliance with United States Laws and Regulations.** It is understood that imports and sales of the Event by JHP may require approvals pursuant to and in compliance with federal and state laws and regulations of the

Market Territory. In order to assure that imports and sales of the Event made pursuant to this Agreement do not violate any applicable laws or regulations, the parties agree as follows:

28.1    JHP shall promptly provide to ZUFFA information on laws, rules, and regulations of the Territory or of any state or political sub-division thereof insofar as such laws, rules, or regulations affect or are likely to affect (i) JHP's rights to distribute or sell the Event; or (ii) ZUFFA's rights under this Agreement.

28.2    JHP shall at all times comply with, and shall require its dealers at all times to comply with, all applicable laws, rules and regulations of the Territory or of any State or political subdivision thereof that affect or impact this Agreement and each party's rights and obligations hereunder or that affect or regulate the manufacture of the Event or their importation into the Market Territory.

## GENERAL PROVISIONS

29.    *Notices.*



30.    *Counterpart.* This Agreement may be executed in counterparts, each shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

31.    *Governing Law; Forum Selection; Consent to Jurisdiction.* This Agreement and its incorporated Exhibits have been delivered at and shall be deemed to have been made and entered into in Las Vegas, Nevada. Accordingly, the rights and liabilities of the parties shall be determined in accordance with the laws of the State of Nevada, without regard to its principles of conflicts of laws. The parties agree that the exclusive jurisdiction and venue for the resolution of any dispute arising from or relating to this Agreement shall lie in the United States District Court, District of Nevada, sitting in Las Vegas, Nevada. Each party irrevocably consents to the service of process in any such dispute if served in accordance with the notice provisions contained herein.

32. **Remedies Cumulative.** Unless otherwise provided for under this Agreement, all rights of termination or cancellation, or other remedies set forth in this Agreement, are cumulative and are not intended to be exclusive of other remedies to which the injured party may be entitled by law or equity in case of any breach or threatened breach by the other party of any provision in this Agreement. Use of one or more remedies shall not bar use of any other remedy for the purpose of enforcing any provision of this Agreement. JHP's sole remedy for breach of this Agreement by ZUFFA shall be an action for money damages and in no event shall JHP be entitled to injunctive or other equitable relief. However, ZUFFA may seek equitable relief against JHP under this Agreement, including but not limited to injunctive relief.

33. **Entire Agreement.** The terms of this Agreement are intended by the parties as a final expression of their Agreement with respect to such terms as are included in this Agreement and may not be contradicted by evidence of any prior contemporaneous agreement. The parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and than no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement.

34. **Modification and Amendments.** This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived or extensions of time for performance be granted, except by written instrument signed by the party to be charged or by its duly authorized agent or as otherwise expressly permitted herein.

35. **Waivers and Extensions.** No waiver or breach of any Agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.

36. **Titles and Headings.** Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provisions of this Agreement.

37. **Schedules.** Each of the Schedules referred to herein and attached hereto is an integral part of this Agreement and is incorporated herein by reference.

38. **Consents and Approvals.** Whenever consent or approval of either party is provided for in this Agreement, such consent or approval shall be given in writing to the requesting party.

39. **Further Assurances.** The parties agree to do such further acts and things and to execute and deliver such additional agreements and instruments as

the other may reasonably require to consummate, evidence or confirm the agreements contained herein in the manner contemplated hereby.

40.     *Assignments and Sublicenses.*  The services to be provided by JHP hereunder are peculiar and special in nature.  Therefore, neither JHP nor ZUFFA shall assign this Agreement in whole or in part without the prior written consent of the other party.   Notwithstanding the foregoing, either ZUFFA or JHP may assign this Agreement or any of its rights hereunder, without the other's consent, to any entity with which it may be merged or consolidated or which acquires all or substantially all of its assets, provided that such an entity agrees in writing to assume all applicable obligations under this Agreement.  Any purported assignment or transfer by either party of any of its rights or obligations under this Agreement other than in accordance with the provisions of this Section shall be void, unless otherwise approved by the parties. JHP agrees it shall maintain a consistent level of integrity, quality and exposure level of the Event during the entire Term of this Agreement to ZUFFA's satisfaction. However, either party shall have the right to assign this Agreement to a subsidiary.  This Agreement will bind and inure to the benefit of the respective successors and permitted assigns of JHP or ZUFFA.

41.     *Partial Validity.*  If any provision of this Agreement is found to be invalid by any court, the invalidity of such provisions shall not affect the validity of the remaining provisions hereof.

42.     *Survivability.*  The respective obligations of the parties under this Agreement, which by their nature would continue beyond the termination, cancellation or expiration of this Agreement, including but not limited to indemnification, audit rights and piracy settlement payments, shall survive termination, cancellation or expiration of this Agreement.

43.     *Audit Rights.* JHP shall keep full, clear and accurate books of account and records with respect to all financial terms, including and not limited to gross license fees, Net License Fees, authorization fees, credit card fees and any miscellaneous event license taxes pursuant to this Agreement. The books and records shall be maintained in such a manner that the quarterly reports required herein shall be readily verifiable.  ZUFFA, and ZUFFA's designated agent (designated in writing by the ZUFFA), shall have the right to examine and audit JHP's records at JHP's business premises upon reasonable prior notice to JHP and during normal business hours.  ZUFFA shall be entitled to examine and audit JHP's records once in any calendar year unless a prior audit by ZUFFA in that year revealed a deficiency. If ZUFFA's audit reveals an overpayment in any payments due to ZUFFA pursuant to this Agreement, such amounts will be credited against the quarterly payments next due. If ZUFFA's audit reveals a deficiency in any payment due under this Agreement, JHP shall remit the amount of the deficiency within 10 days after demand therefore together with interest at a rate of seven percent (7%) per annum. If any such audit shows a deficiency of

greater than five percent (5%) with respect to the amounts that should have been paid to ZUFFA, the reasonable cost of such audit shall be paid by JHP. After twelve (12) months from the date of any quarterly report and corresponding payment, that quarterly report shall be deemed final and binding and ZUFFA shall have no further right to contest the report or payment of ZUFFA's revenue share as specified therein. Notwithstanding the foregoing, if JHP disagrees with the results of an audit by ZUFFA, JHP and the ZUFFA shall mutually agree upon a third party accounting firm to review ZUFFA's audit and the results thereof shall be binding on ZUFFA and JHP.

44.    *Corporate Authority.*  Each individual executing this Agreement on behalf of any corporation which is a party to this Agreement represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation, and that this Agreement is binding upon said corporation on accordance with its terms.

45.    *Language.*  This Agreement has been negotiated and written in English. The English text shall be the only controlling text.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the first written above.

"ZUFFA, LLC"

By: _____

Printed Name: _____KIRK D. HENDRICK_____

Title: _____CHIEF OPERATING OFFICER_____


"JHP"

By: _____

Printed Name: _____JOE HAND JR_____

Title: _____President_____

## ADDENDUM TO DISTRIBUTORSHIP AGREEMENT

This Addendum ("Addendum") to the existing Distributorship Agreement between the parties hereto is made and entered into effective July 16, 2009, by and between Zuffa LLC d/b/a the Ultimate Fighting Championship® ("UFC") organized under the laws of the State of Nevada, with its principal place of business located at 2960 West Sahara, Las Vegas, Nevada 89102 ("ZUFFA"), and Joe Hand Promotions, Inc., a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 407 E. Pennsylvania Boulevard, Feasterville, Pennsylvania 19053 ("JHP"), both of whom are referred to collectively herein as the "Parties".

### RECITALS

**WHEREAS**, the Parties entered into a Distributorship Agreement effective as of December 1, 2007 (the "Agreement"), the terms of which are incorporated herein by reference;

**WHEREAS**, the original Term of the Agreement extended until December 31, 2009;

**WHEREAS**, the Parties have negotiated an extension of the Agreement as contemplated by paragraph 5 ("Term") of the Agreement;

**NOW THEREFORE**, in consideration of the foregoing and the additional promises and consideration set forth herein, and intending to be legally bound, ZUFFA and JHP agree to modify the Agreement as provided for in paragraph 34 ("Modifications and Amendments") as follows:

1.   **EXTENSION OF TERM.**   The term of the Agreement is hereby extended up to and including June 30, 2012.

2.   **SPECIAL FINANCIAL TERMS FOR UFC 100.**



3.   **FINANCIAL.**

13. 

4.  **PROMOTIONAL MATERIALS ACCOUNTING.**

5. **TERMINATION.**



6. **EFFECT ON OTHER PROVISIONS.** All other provisions of the Agreement not modified by this Addendum remain in full force and effect.

[This space has been intentionally left blank.]

**IN WITNESS WHEREOF**, the parties have executed this Agreement effective as of the first written above.

"ZUFFA, LLC"

By: _____

Printed Name: KIRK D. HENDRICK

Title: CHIEF OPERATING Officer

"JHP"

By: _____

Printed Name: JOE HAND JR

Title: President